1-11-0369 Bronislaw v. ITT Ballant Gossett Good morning. May it please the court, counsel. My name is Joe Hetherington. I represent the petitioner in this case, Bronislaw Szzeliga. Let me begin by acknowledging what those of us who practice workers' compensation law know to be true. It is very difficult to win an appeal based on an argument that a decision of the Workers' Compensation Commission was against the manifest weight of the evidence. And let me say that it should be very difficult. As a long-time practitioner, I think it would be terrible for the system if the appellate court made it easy to win manifest weight appeals. A decision of the Workers' Compensation Commission should only be reversed in a truly exceptional case where the overwhelming weight of the evidence compels a conclusion opposite to the conclusion the commission has reached. Why do I have the feeling you're going to argue that this is such a case? This is just such an exceptional case. And I'm sure you have all heard other counsels say this before, maybe many times before, but this is truly that exceptional case where the commission made a mistake. There is no question in this case that the petitioner, Mr. Szzeliga, was involved in a work accident on December 9, 1998. There's no question that he sustained a significant physical injury as a result of the work accident, an injury to his right knee and right leg. There's also no question that he suffers from a very severe psychological condition, a major depressive disorder with psychotic features that has rendered him totally disabled for all purposes, not only for work, since January 29, 2000. What's Dr. Carrington's opinion?  What was Dr. Carrington's opinion? Well, Dr. Carrington's opinion was that Mr. Szzeliga may be suffering from organically based dementia. He opined that his psychological condition was not causally related, didn't he? Well, he had two bases for that opinion. Did he opine that? Yes, he did opine. Why couldn't he accept that opinion? There are two reasons why the Commission shouldn't have accepted that opinion. First, the opinion was based on an incorrect assumption about the facts. He testified that there couldn't be – he acknowledged that a work injury and subsequent job loss could trigger a condition such as Mr. Szzeliga had. But he said in this case it didn't do so because the psychological symptoms didn't manifest themselves until more than three months after the accident. He said they have to manifest themselves within three months or he can't say there's causation. Well, that's based on the DSM-IV criteria. Right. But to reach the conclusion that there were no symptoms, he has to completely ignore the testimony of the Petitioner's wife and daughter. And they testified, and their testimony was very consistent with one another, that from the very day of the accident, the Petitioner exhibited signs and symptoms of psychological disturbance. When he came home on the day of the accident, he looked, they said, startled, like he was in shock. Now, you may feel, and certain respondents feel, that his reaction was excessive and extreme. And who knows why he had this reaction. But the fact is he had this reaction. And their testimony on this point is corroborated, at least to some extent, by the initial records of the company clinic, Advocate Occupational Health Center. It's striking, I think, that there are, I think, at least three notations in the records in the weeks after the accident that Mr. Shaliga was very anxious and upset about his injury. It's unusual for a company clinic records to have notations like that. Would that be unusual for somebody that sustained a serious injury to be anxious and upset? Does that mean he's suffering from psychological problems? Not necessarily. But I've been doing this work for 35 years, and I'd submit that it's unusual for a clinic doctor to note a psychological upset like that. Is there any evidence in this record to suggest that he had this condition prior to the accident? No. And I think that's an extremely important point. The wife and daughter testified unequivocally that Mr. Shaliga was completely healthy psychologically before this accident, that he was a happy person, he was a family man, he was absolutely normal. And keep in mind that the petitioner worked for, responded for four years before the accident. If the testimony of the petitioner's wife and daughter was not true in that regard, it would have been easy for them to bring in some people to say this guy was crazy. Well, arguably it would have been a better case had he had. Pardon? It might have been a better case had he had. Possibly. But I think it's a cleaner case that you have a man who was completely healthy psychologically before the accident who went crazy after the accident. And you have to ask yourself, why did he go crazy? The obvious explanation for why he went crazy is the explanation given by Dr. Brilliant in his testimony. Sort of a catchy name for Dr. Brilliant. Yes. And his testimony was, I mean, he related in his testimony the history that he obtained from the petitioner and the petitioner's wife, that the petitioner was involved in a work accident, and that after the work accident, his personality changed. He was not himself, as the way the record put it. Did all these symptoms manifest themselves right after the accident, or did some of them manifest themselves after he lost his job? Didn't they escalate after he lost his job? Oh, yes. But the testimony of the wife and daughter was that they manifested themselves immediately. They continued up to the time of the termination, three months after the accident. Got worse thereafter to the point where he was finally admitted to the hospital, to Lutheran General Hospital, in January of 2010. Arguably, what was the termination cause for the termination? Well, Your Honor, there was an agreement between counsel prior to the trial that we would not have a sub-trial on why he was terminated. So it was agreed that what would go into evidence was that he was terminated in, I believe, March 15, 1999. But there is nothing in the record that explains why he was terminated. So we can't infer anything from that? No, I don't think so. But I think that what you have to keep in mind when you decide this case is that the work accident only has to be a cause of the psychological condition, not the only cause. And if you conclude that the job loss shouldn't be considered as supportive of the petitioner's claim, you should still find it in the petitioner's favor because Dr. Brilliant said it was both the injury and the job loss that were psychological stressors that triggered the major depressive disorder. What really tips the scales here? Because you've quoted Brilliant's opinion, who obviously supports the claimant's position. You have Carrington, who ties it into DSM-IV and says, no, this was not the stressor. You're too far after. It's too remote in time, so it's not connected to the work injury. So what tips the scales in the claimant's favor in the prism of the manifest way to be evidence? What I think tips the scales are two things. The first is that when you look at all the evidence, there's only one reasonable conclusion that you can draw. The simple fact is that the petitioner was healthy before this accident and he went crazy. He literally went crazy after the accident. I think the only reasonable conclusion you can draw from the evidence is that he went crazy for the reasons stated by Dr. Brilliant. That is that the stressors of the accident and the injury and the job loss sent him into a psychological tailspin from which he couldn't recover. The second thing that I think should tip the scales in the petitioner's favor, and getting back to Justin. I have a problem with how you're dealing with this job loss. On the one hand, I guess I'm saying, well, if counsel's agreed here, we're not going to talk about the reason for the job loss. But there has to be some connection arising out of and in the course of. Isn't your argument better that there's some evidence that after the physical injury, because this is a physical mental case, that the elements of the physical injury, not job loss, physical injury, led to causing in some manner this psychological condition? Well, as I said, it's enough if the accident and the physical injury alone were a cause and the job, even if you want to completely discount the job loss. I think you can infer from the sequence of events that the job loss was related to the accident and the injury. But even if you don't do that, there's plenty of evidence that the accident and injury themselves were sufficient cause. Let me give you an example. The second psychiatrist that Mr. Shaliga saw, Dr. Hong, has a history in his records that Mr. Shaliga had been experiencing suicidal feelings, feelings of helplessness and hopelessness and nightmares since the accident. And these records were made long before this case was litigated. Every reason to believe that those records are true. Look at the records of Lutheran General Hospital, the first psychiatric hospitalization. The records state that the factors contributing to his major depressive disorder included the job loss, but it also included the accident and the work injury and the operation on the knee. So on the one hand, you have all this evidence indicating that the cause of the severe psychological decline that the petitioner experienced was the accident and the work injury. On the other hand, you have Dr. Carrington, and as I already explained in answer to Justice Hoffman's question, one reason why you should discount that testimony. The other reason is that he throws out a mere possibility that Mr. Shaliga is suffering from an organically based dementia. And I think you should completely disregard that testimony. It doesn't even count as evidence. It's pure speculation. The basis for it is a single CAT scan report from 2000 that shows mild cortical atrophy. And Dr. Carrington himself acknowledged that that is a slight abnormality. That's an exact quote. He didn't go so far as to say that that slight abnormality was sufficient to form the opinion that there was an organically based dementia. The best he could say was that it suggests that diagnosis. I submit that if on the one hand you have really powerful evidence, the testimony from the wife and daughter, the medical records that consistently relate the condition to the work accident, and the evidence that he was healthy before the accident. So how long after the accident did he end up being treated at Alexian Brothers? Well, his first psychological care was at Lutheran General January 29th. How long after the accident was it? Well, Lutheran General was 14 months, and then when Dr. Brillian saw him, by that time it was almost three years after the accident. I believe that was October of 2001. How do you explain the fact that the Alexian Brothers treatment records indicate the claimant himself specifically denied any previous episodes of depression or suicide attempts? That's what the records show. First of all, I'm not sure how reliable, how complete Mr. Shaliga's responses could be at that point. I mean, he was obviously in severe psychological distress. So I can only assume that he was unable to give a completely accurate history there. But I think it's – But what observations were made? I mean, he may not be giving this history, but we've got a medical care professionals that are – Do you have any observations in those records at that time about his demeanor? Well, are you talking about after he started getting the psychological care? Before. Before. No, it's true. And I would say the only – Counsel, your time is up. You'll have time on rebuttal. Thank you. Counsel, please. May it please the Court. Counsel, my name is Peter Lorenz on behalf of the employer ITT. I'd like to begin by recognizing what counsel recognizes, which this is obviously a manifest weight case, that in only the rarest of circumstances ought this Court reverse, and that these are obviously not those circumstances, that the evidence is overwhelming at a minimum, but certainly proper inferences were drawn by the arbitrator and the commission, finding that the petitioner failed to prove causal connection on the fundamental question of psychological injury. But I'd like to suggest that although counsel urges that this is just a manifest weight case, his brief says just that issue is here before you, that he's really urging something a little more, which gets perhaps to Justice Holder's question as to arising out of on the psychological injury. This Court's pretty strict on its view of psychological injuries. Let's accept that this case is alleged to be a physical mental case. The physical mental case most like this case, likewise cited by counsel and myself, is Matlock, a physical case resulting in mental injury. Matlock is actually only one of three cases cited by counsel, the first being Pathfinder, the Supreme Court case, which is mental mental, but lays out a pretty clear groundwork for how we look at these cases and the commission should too. But let's talk about the facts in the Matlock case. The Matlock case adhering to Pathfinder adhered to the fundamental principle that a sudden, severe emotional shock has to accompany a physical injury, even if that physical injury is relatively minor. Matlock was a case involving an overseas flight attendant who mid-flight, mid-flight, pre-9-1-1 days, had to confront and secure a very bizarre, possibly hostile, possibly violent passenger. The employee in that circumstance wasn't a passenger ten rows back that could reach for rosary beads. She had to confront and secure the individual. There was a relatively minor injury resulting from the spraying of some kind of dental anesthetic that the claimant breathed. Other passengers in the flight breathed it as well. The flight had to be diverted. The flight didn't go where it was supposed to be going. When it got to the ground where it was going, almost immediately psychological care ensued for the claimant and other passengers. But for the claimant, ensued and was paid for by the employer. Circumstances permitted the employee to get back across the pond. She got here. The employer then declined to continue the psychiatric or psychological care of the therapy. And then the claim generated from there, based on a denial that the injury hadn't occurred. We just don't have this in the circumstance. It's important to remember relative to Justice Holdridge's question that the testimony of Dr. Michael Brilliant, that I think the arbitrator pretty fairly summarized, says that the loss of the job and the loss of the social status is what led to the development of the depression. Okay? So not the sudden severe emotional shock of the injury that the claimant in fact suffered here. It could have been in different circumstances in this case that the fear of being, let's say, might have in that particular circumstance been a claimant that realized severe emotional shock. Again, getting to Justice Holdridge's point, wouldn't this case have been better had that been either an eggshell claimant or a claimant with a history of psychological care prior to that injury? Yes is the answer to that. Now, the next question that the Court confronts is the commission weighing the evidence of medical experts. We have the testimony of Dr. Brilliant, which I just told you about, and then the testimony of Dr. Carrington, who is board certified, who has opportunity over years to have dealt with what the psychiatric profession refers to as stressors, stressors in all kinds of different circumstances relative to the practice of Dr. Carrington. They were significant with the practice associated prior to his testimony in this claim with counseling patients at Cook County Hospital and inmates at Cook County Hospital. But the stressors is a psychological and psychiatric term as it relates to this particular case for separation, separation that all of us will face of significance, most significantly death of a loved one or someone close. That's separation. The other separation commonly experienced by the population in general is divorce. That's a sudden and that is a clear separation. It has psychiatric manifestations that sometimes lead to psychiatric care. Relative to this circumstance, separation from employment. So let me ask you this. Is the delay in the onset of the symptoms a significant factor? No question that it is. There's no question that it is for two reasons. First of all, the DSM definition that the Justice has referred to Dr. Carrington takes particular task with. They must manifest themselves within actually three to six months of the stressor appearing. Now, let's accept in the psychiatric term here that the stressor was separation from employment about four months after the accident. A particular note to Dr. Carrington was that upon presentation for let's say significant and then ongoing psychiatric care that didn't commence until approximately 14 months after the injury, approximately 10 months, 11 months after the employment separation, there was no mention whatsoever of specific as opposed to general suicidal ideation. Now, we have on this record the testimony and pretty unusual proceedings from the spouse and the spouse's daughter as to suicide attempts that take us a little closer in time to the separation from employment. But even there, that doesn't fit the DSM definition chronologically and more importantly as Dr. Carrington pointed out. And as is the province of the commission to weigh and decide, none of that was referenced when Petitioner finally was admitted to Alexiom Brothers at the end of January of 2000 for a prolonged period of psychiatric care. In fact, just the opposite, and just the opposite as appended by counsel to his brief, is a specific reference to the intake notes of the nurse in which the patient admits passive suicidal thoughts. Passive suicidal thoughts. Now, again, we're talking about a period of time that's removed 14 months from the physical injury, 11 months removed from the separation stressor. There was no mention by either the claimant, it is acknowledged, it does come out in the depositions, that there is limitation obviously for psychiatric patients as to what kind of history they can give. But there's also testimony from both that they rely, they have to rely, on collateral sources, loved ones, spouses. And that that history is conspicuously absent when there was a presentation on 129. And even if you wind the clock back yet another month, when for claimant more significant psychiatric symptoms that may be observable to a layman occurred, and a spouse perhaps, and maybe even himself, decided to go first see his treating physician, Dr. Sackowitz, who referred him to a psychiatrist with a Polish surname within that community that he may have trusted, there was no specific reference of suicidal ideation whatsoever. So at the outset, opposing counsel made a reference to the theory, and it is well settled, that to be compensable, the accident need not be the sole or even the primary cause of the condition complained of. Recovery could be based if it accelerates or aggravates the condition. Is that a possible theory of recovery here? If not, why not? It isn't in this case, and it isn't in this case primarily for the reason that unlike Matlock and like other appellate court cases, and one supreme that I mentioned in my brief, there wasn't the severe sudden emotional shock either at the time of the physical injury that then very soon thereafter led to some kind of psychiatric care. Or if we accept the significant separation, stressor, a term used in the psychiatric community of employment separation, there didn't commence psychiatric care soon after that. In fact, there was an 11-month period of time after that. That's the primary difference that this makes. Let me ask you this. Dr. Carrington refers to some alleged abnormal brain scans on the claimant's part. What do you make of that? Counsel correctly said that it is a CAT scan that refers to or appears to demonstrate abnormal early cortical shrinking. That's essentially what it indicates. Now, Dr. Carrington on that particular point, it must be said, was cautious on it. Now, please understand in the Section 12 context, and specifically in the very difficult Section 12 context of this circumstance, the examining physician was only able to do a limited amount of things. One is review a mountain of psychiatric records. One, two, conduct an examination under very limited circumstances so that had it been the case, for instance, that Dr. Carrington would have been the treating physician for this individual and been able to do a full run-up on whether that cortical shrinking might have been severe, might have accounted for it, there might have been more there. But the important point on your question is counsel is asking this Court to substitute its judgment for that of the commission on that question. It saw, first of all, the testimony of the witnesses and also weighed the relative medical evidence, not just of the experts, but in a record that ran in excess of 2,000 pages. It occurs to me the two of you seem to be arguing that there's only one right answer to this on the issue of causation. My reading of this record is the commission could have decided it either way. They decided it in your favor. It's supported by Covington's opinion. And so it's the essential argument. And the rest of this stuff is nothing more than window dressing that supports your position or his position. And if that's accepted as true, I respectfully think that the evidence is a little stronger than you summarize there. But even if it is, counsel is asking, Petitioner is asking you to substitute the judgment that this Court has said in time-honored cases I don't need to cite as the province of the commission to decide. And there is an evidence that the opposite result is absolutely compelling. The only other case of the three cases cited by counsel in this brief is Homerding, and it's specifically on the question of Manifest Wade. Now, just if I have any time left. You have about two minutes. Okay. Counsel made reference to how respondent or employer may feel, how this Court may feel as it relates to the actual psychiatric injury. Again, I urge, it isn't about what employer feels or this Court feels. It's the province of the commission to decide that. I'd likewise reference that there was no agreement to not present evidence on the basis for employment discharge. It just wasn't presented. Had it been presented, it is, in fact, reality that a subtrial of a kind would have occurred on that issue and evidence would have been put on. But there wasn't a subject, there was no agreement for it. It just was not put on. This is an important point because in cases like the Chicago Park District case, the Chicago Park District case basically being a mental physical case in which the entire very hostile employment environment was demonstrated and laid out by testimony as to an attorney that was physically assaulted, had been mistreated before the physical injury and likewise was mistreated after the physical assault was involved with punching into the chest, psychiatric or psychological care ensued. And that's why that's an important point. Counsel made reference, and the last point I'll make is that his client literally went crazy after the accident. As an employer, or even if I wasn't representing the employer, I can't deny that temporally admission to a hospital and significant and severe psychiatric depression was diagnosed and treated. That is a reality. But also the reality is that there was a significant gap before those symptoms began to manifest themselves in a very significant way in which loved ones and perhaps the claimant himself was able to get himself in for psychiatric care. And these are not circumstances I would submit to the court in which what was decided by the arbitrator and the commission is against the manifest weight. Thank you, counsel. Your vote, please. I'll be very brief. First, I'd like to respond to what counsel said about Matlock. He attempted to distinguish Matlock on the basis that in Matlock there was a severe immediate emotional shock and in this case there was not. Well, again, there's testimony in this case from both the wife and the daughter that when Mr. Shaliga came home on the day of the accident, he looked very startled and very nervous as if he was in shock. That was the testimony. So I submit that there's no real distinction in that regard between Matlock and in this case. As I previously said, your honors may feel that his reaction to this accident was extreme, but to that extent he's an eggshell petitioner. And I can't explain why this accident affected him the way it did, but it obviously affected him very severely from the beginning, psychologically affected him. Second and last, let me say this. That to uphold the commission's decision, you have to do two things that I don't think it makes sense for you to do. First, you have to completely discount the testimony of the petitioner's wife and daughter. And I don't know if I said this already, but even if I did, it's worth repeating. The arbitrator who heard the testimony didn't question his credibility. And they testified that he had these problems immediately after the accident. They continued right up to the time of his first psychiatric hospitalization. The second thing you have to do to uphold the commission's decision, it doesn't make sense to do it, is the equivalent of believing in the tooth fairy. You have to believe that this perfectly normal guy went crazy by coincidence a year after the accident. If you first discount the testimony of the wife and daughter, that he was going crazy gradually from the time of the accident up until January of 2010, January of 2000, then you have to believe that all of a sudden, in January of 2010, he went crazy. Well, why did he go crazy? He didn't have any preexisting psychological problems. He had no family history of mental illness that would support the hypothesis that his mental illness at that time was congenital in nature. Let me just ask you this question, and this has been a theme that's running through here. Sometimes when people retire, don't they go into severe debilitating depression? Ordinarily healthy individuals, loss of a career, loss of a lifestyle, doesn't that sometimes happen? I'm sure it happens. And so I guess one possibility would be that one possible hypothesis here would be after the job loss, and completely distinct from the accident and the injury, he went crazy because he wasn't working. But, again, getting back to my point earlier that you repeated to counsel, the accident only has to be a cause. In addition to the fact that he was healthy before the accident and there's no family history, there is the fact that there are no indications in the record of any other stressors in his life in the period after the accident, besides the accident and the work injury and the job loss, that could have caused him to go crazy. There was no death in the family. There's no marital conflict. There's no physical illness other than the knee injury that might have sent him into a tailspin. So, again, to uphold the commission, you have to discount the testimony of the wife and daughter, and then you have to believe in something that I think is inherently unbelievable. Thank you, counsel. He went crazy by coincidence. The time is up. Thank you for your attention. Clerk will take the matter under advisement for disposition. Clerk, please call the next.